IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE:<br><br>DAWN ELLEN SHRUM,<br><br>      Debtor. | Case No. 3:17-bk-06895<br>Chapter 11 |

## **BANK OF NEW YORK MELLON'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO CONFIRMATION**

COMES NOW, The Bank of New York Mellon FKA the Bank Of New York, As Trustee for the Certificateholders of the CWALT, Inc., Alternative Loan Trust 2006-OC10, Mortgage Pass-Through Certificates, Series 2006-OC10 ("BONY"), and files this Memorandum of Law in Support of its Objection to Confirmation of the Debtor's Chapter 11 Plan [Doc. 82] (the "Plan"), respectfully showing this Honorable Court as follows:

## **INTRODUCTION**

BONY is the holder of a deed of trust that encumbers the Debtor's principal residence. The deed of trust is on a standard Fannie Mae/Freddie Mac form, used in millions of mortgage loans around the country. The particular form mandates that the Debtor pay a certain amount every month to enable the mortgagee to pay taxes and insurance. It also assigns certain contingent funds to the mortgagee (such as condemnation funds) that serve to protect the mortgagee if the value of the property decreases due to certain events.

The Debtors takes the untenable position that these provisions take BONY's claim outside of the anti-modification provision of 11 U.S.C. § 1123(b)(5). However, nearly every court to look at this issue – including the Fourth Circuit analyzing the *exact same* deed of trust form – has concluded that these provisions do not make the claim modifiable. To hold otherwise

1

would not only be counter to the law, but also to the intent of Congress in passing the anti-modification provision, as it would leave millions of loans at risk of being modified. As the Fourth Circuit noted, the Debtor's position "cannot be squared with an interpretation that would render the anti-modification provision inapplicable to virtually all mortgages." *Birmingham v. PNC Bank, N.A. (In re Birmingham)*, 846 F.3d 88 (4th Cir. 2017). This Court should deny confirmation of the Debtor's Plan.

## STATEMENT OF FACTS

As noted by the Debtor in her brief, there are two provisions of the subject deed of trust (the "Deed of Trust") that she contends takes BONY's claim outside of the protections of the anti-modification provision. Those provisions are Sections 3 and 11. Section 3 reads as follows:

> **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender

may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

Section 11 reads as follows:

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened, During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be

3

undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment,

precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

The Deed of Trust defines "Miscellaneous Proceeds" in Section (N) of the Definitions Section on the second page:

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

The Debtor contends that these provisions serve to secure more property than just her principal residence, and as such, she can modify BONY's claim. This is incorrect, and this Court should deny confirmation of the Plan.

## ARGUMENT AND CITATION OF AUTHORITY

**A.     OVERVIEW OF THE LAW**

To begin with, BONY mostly agrees with the Debtor regarding the test to be applied by this Court.[1]

Conforming *Reinhardt* and *Davis* creates a two part test. First, under *Reinhardt*, the question is simple: is the property subject to the security interest real property under state law? If not, then it constitutes additional security unless it fits within the confines of the exceptions outlined in *Davis*: does the property function as replacement of the underlying collateral or is it bound up in the bundle of possessory rights? If neither of these exceptions apply, then the security constitutes additional collateral and the anti-modification clause does not apply.

---

[1] However, for purposes of preserving the record, BONY contends that the Sixth Circuit was incorrect in *Reinhardt* when it concluded that the definition of "debtor's principal residence" in 11 U.S.C. § 101(13A), which extended the principal residence to "incidental property," was distinct from and could not be applied to the anti-modification provision of 11 U.S.C. § 1123(b)(5). BONY recognizes that this Court is bound by that decision, but explicitly preserves its right to challenge this decision should this case be appealed.

[Doc. 120] at p. 6, ¶ 18.

However, the decision in *Davis* is not so absolute as applying only to property that "functions as replacement of the underlying collateral or is bound up on the bundle of possessory rights." The Sixth Circuit also said that items which are "incidental to an interest in real property" are also an exception. *Allied Credit Corp. v. Davis (In re Davis)*, 989 F.2d 208, 212 (6th Cir. 1993).

B.     **THE DEED OF TRUST DOES NOT GRANT A SECURITY INTEREST IN ESCROW FUNDS**

First, the Debtor contends that "the assignment to BONY of the Debtor's interest in the escrow account constitutes additional security under Sixth Circuit case law." [Doc. 120] at p. 6, ¶ 19. The Debtor reasons that the funds are additional security "[b]ecause certain situations exist when BONY may apply the escrow funds to the loan balance . . . ." *Id.* at p. 7, ¶ 22. This argument fails for two reasons – 1) the Debtor is wrong that the escrow funds can be applied to the loan balance; and 2) escrow funds are essential to the protection of the collateral.

First, it is not even necessary to look at whether the escrow funds are essential to the protection of the collateral, because BONY does not have a security interest whatsoever in the funds. The Deed of Trust explicitly defines how payments are to be applied, and nothing permits funds for escrow items to be used to pay down the principal or interest. According to the Debtor, the Deed of Trust *does* allow this, arguing as follows:

> Because certain situations exist when BONY may apply the escrow funds to the loan balance, they constitutes additional collateral securing BONY's interests. The Deed of Trust specifically states that: "Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply Funds at the time specified under RESPA ..." Under Regulation X enacted with respect to RESPA, the mortgagee shall refund any surplus in the escrow account over fifty dollars and may refund or apply to the next year's escrow account any surplus under fifty dollars if the mortgagor is current. 24 C.F.R. §

> 3500.17(f)(2)(i). However, if the mortgage servicer does not receive payment within 30 days of the payment due date, the servicer may retain the surplus in the escrow account in accordance with the mortgage loan documents. 24 C.F.R. § 3500.17(f)(2)(ii). Meanwhile, the Deed of Trust states that BONY shall refund any excess funds to the Debtor upon full payment of the loan. Deed of Trust, ¶ 3. The Deed of Trust also allows BONY to hold the funds in an amount sufficient to apply the funds in the manner specified in the Deed of Trust. Paragraph 2 of the covenants in the Deed of Trust governs the application of these payments. It provides that BONY shall apply all payments first to interest due under the promissory note, then to principal due under the promissory note, and then to amounts due for escrow items. In the event that the Debtor has more than one payment outstanding, BONY may apply any payment received from Debtor to the "Periodic Payment" until it is paid in full. Id. at 3–4, ¶ 2. The document defines "Periodic Payment" in Section N of the Definitions as "the regularly scheduled amount due for (I) principal and interest under the Note, plus (II) any amounts due under Section 3 [Escrow Items] of this Security Instrument." Id. at 2.

[Doc. 120] at pp, 7-8, ¶ 22.

However, it is not clear how the Debtor could impart such a meaning to this language. The plain language of the cited RESPA regulations[2] and the Deed of Trust requires a lender to segregate escrow funds into a separate account and pay escrow items from that account. If there is a surplus over $50 at the end of the year, it gets refunded to the debtor, but if under $50 (or the borrower is behind more than one payment), it simply remains in the escrow account. It does not get applied to the loan balance. The remaining language cited by the Debtor pertains to application of payments. It specifies how funds that are received get applied to principal, interest, and escrow items. Nowhere in the Deed of Trust can BONY dip into escrow funds and apply those funds to principal and interest. The Debtor herself never explains her argument, and simply quotes language from the Deed of Trust, but that language does not support her argument.

---

[2] As noted in the next paragraph, the Debtor's argument is nothing more than a verbatim copy and paste job from *In re Thomas*, 344 B.R. 386, 390-91 (Bankr. W.D. Pa. 2006). This includes citing to federal regulations that are no longer applicable. This is because the CFPB took over rulemaking authority for RESPA and published new regulations concerning escrow accounts in 2011 (five years after *Thomas*). The new regulation is codified at 12 C.F.R. § 1024.17.

7

The Debtor's argument is nothing more than a verbatim recitation from *In re Thomas*, 344 B.R. 386, 390-91 (Bankr. W.D. Pa. 2006). In that case, the Court simply set forth the language cited above and said, without explanation, that "the mortgage is clear that, under some circumstances, [the lender] has the ability to apply payments to its debt even though the money used is from the escrow and [the lender] has an obligation to refund any excess to the Debtors when the loan is paid in full." 344 B.R. at 391. This conclusion makes no sense, as the application of periodic payments *includes* applying funds to escrow. *See Mullins v. Wells Fargo Bank, N.A. (In re Mullins)*, No. 11-2049, 2012 WL 2576625, at *2 (Bankr. M.D.N.C. July 3, 2012) (finding that an identical "provision simply directs how payments are to be applied as they are received and does not serve to create a security interest.").

The second case cited by the Debtor, *Stevens v. SunTrust Bank (In re Stevens)*, 581 B.R. 534 (Bankr. N.D. Ohio 2015) is even more inapplicable, as the Court there was presented with a completely different security instrument that explicitly said that "[t]he Escrow Funds are pledged as additional security for all sums secured by this Security Instrument." 581 B.R. at 537. This language is not present in the instant case. In another similar case, a bankruptcy judge found that "a standard Fannie Mae/Freddie Mac deed of trust 'does not contain elements required to create a security interest in Escrowed Funds.'" *Birmingham*, 846 F.3d at 98 (quoting *Bynum v. CitiMortgage, Inc. (In re Bynum)*, Nos. 12-10660, 12-2013, 2012 WL 2974694, at *3 (Bankr. M.D.N.C. July 19, 2012). Quite simply, the Debtor's position is untenable and BONY has no security interest in the escrow funds.

Even if BONY did have some sort of security interest in the funds, they are essential to the protection of the collateral and do not take the claim outside of the anti-modification provision. In *Davis*, the Sixth Circuit was faced with a similar argument from a debtor who

8

executed a deed of trust. 989 F.2d 208. The deed of trust, in addition to the real property itself, conveyed "the Hereditaments and Appurtenances, rents, royalties, profits, and fixtures thereto appertaining . . . releasing all claims to homestead and dower therein." *Id*. at 209. The deed of trust also required the debtor to maintain insurance and assigned all proceeds to the lender. *Id.* The Sixth Circuit held that these provisions did not take the claim outside of the anti-modification provision. With respect to "the Hereditaments and Appurtenances, rents, royalties, profits, and fixtures thereto appertaining," the Court found that "the referenced phrase refers to benefits which are merely incidental to an interest in real property, and . . . does not constitute additional security for purposes of § 1322(b)(2)." *Id.* at 212. With respect to insurance, the Court came to a similar conclusion, finding that "hazard insurance [is] an essential protection of the underlying collateral" and is not additional collateral. *Id.*

Last year, the Fourth Circuit in *Birmingham* was faced with similar arguments and an *identical* deed of trust. *See* 846 F.3d at 94. Relying on *Davis*, the Court held that the Sixth Circuit's reasoning regarding hazard insurance "similarly applies to . . . escrow funds that are tied to the real property at issue." *Id.* at 96 (citing *In re Ferandos*, 402 F.3d 147, 156 (3d Cir. 2005); *Kreizer v. Household Realty Corp. (In re Kreitzer)*, 489 B.R. 698, 703-06 (Bankr. S.D. Ohio 2013)). This conclusion makes perfect sense – collecting funds to pay taxes and insurance ensures that the mortgagee's collateral is protected. If taxes go unpaid, the collateral could be lost at tax sale, and if insurance goes unpaid, the lender may lose its collateral (or the collateral may lose value) if the property is lost or damaged without insurance to pay for repairs. In other words, these funds provide "essential protection of the underlying collateral." *Davis*, 989 F.2d at 212. This alone is sufficient to conclude that BONY's claim is protected by the anti-modification provision.

9

The conclusion reached by *Birmingham* was by no means an outlier. To the contrary, *Thomas* is the outlier case.[3] *See Birmingham*, 846 F.3d at 96 (collecting cases); *see also In re Darlene M.*, 542 B.R. 774 (Bankr. N.D. Ohio 2015). Indeed, it would not be a stretch to suggest that *Davis* (which is part of the *Birmingham* line of cases but is binding on this Court) commands a finding in favor of BONY. In *Davis*, the Sixth Circuit was guided in its holding by the fact that every deed of trust required property insurance, and "[t]o interpret 'additional security' to include mandatory hazard insurance would defeat the purpose of § 1322(b)(2), which is to protect creditors." 989 F.2d at 211 (citation omitted). In other words, the protection would be "completely eviscerate[d]." *Id.* (quoting *In re Braylock*, 120 B.R. 61, 63 (Bankr. N.D. Miss. 1990)). This exact concern was echoed by the Fourth Circuit in *Birmingham*. 846 F.3d at 99. Because nearly every deed of trust contains an escrow requirement, the exact same concern present in *Davis* is also present here and should lead this Court to deny confirmation of the Plan.

C. **MISREPRESENATION DAMAGES ARE PART OF THE BUNDLE OF RIGHTS THAT PROTECTS THE CLAIM FROM MODIFICATION**

In her final argument, the Debtor contends that "the assignment of the proceeds or damages from misrepresentations regarding the Property's value or condition are additional collateral that eliminates the protections of the anti-modification clause." [Doc. 120] at p. 8, ¶ 24. This is yet another contention that is contrary to the great weight of available authority.

The Debtor admits that "proceeds or damages for misrepresentation of the Property's value or condition would appear to simply constitute replacement security," *id.*, but goes on to argue "that is not the case as proceeds or damages could be in excess of the value of the

---

[3] *Stevens* is not necessarily an outlier, as the Court in *Birmingham* recognized cases in which the loan documents "expressly provided that escrow payments constituted additional security for the loan" are inapposite and are "unequivocally distinguishable from the language present in the Birmingham [and Shrum] Deed of Trust. [These] holdings therefore do not apply to this case. 846 F.3d at 98.

10

Property" due to punitive or treble damages. *Id.* This is the extent of the Debtor's argument, and she does not explain why an award in excess of the property value would be relevant, especially as the Deed of Trust does not allow BONY to keep these additional amounts. *See* [Doc. 120-1] at pp. 12-13 (any amounts in excess of the debt must be paid to the borrower). Indeed, in *Davis*, the Sixth Circuit held that security in profits and rents do not take a claim outside of the anti-modification provision, and those amounts could easily exceed the debt or property value. *See* 989 F.2d at 212.

The only case cited by the Debtor in support of her position is, again, *Thomas*. In that case, the Court conducted no reasoned analysis and simply jumped to the conclusion that "these proceeds can result only from a chose in action. A chose in action is clearly not real property that a debtor uses as a principal residence. Damages awarded as a result of misrepresentation of, or omission with respect to, the value or condition of the real estate similarly are personalty and arise from prosecution of a cause of action." 344 B.R. at 393. While it is reasonable to conclude that "a chose in action is clearly not real property," that clearly does not end the analysis. Fortunately, that analysis was already done by the Southern District of Ohio:

> The proceeds from a cause of action for misrepresentation of the value or condition of the real property that is the subject of a mortgage is not additional security and is the type of "incidental benefit" which the Sixth Circuit found is "inextricably bound to the real property itself as part of the possessory bundle of rights." *Davis,* 989 F.2d at 213. It would be illogical to determine that if proceeds used to compensate for the diminishment in the value of property securing a loan as a result of fire or a storm are part of this "bundle of rights," that proceeds used to compensate for value that was misrepresented and upon which that loan was based are not part of that same "bundle of rights." Thus, it should make no difference if the value upon which the real estate loan is based is wiped out by storm or fire or because the value was misrepresented in the first place—in either case the proceeds are part of the same bundle of rights—rights intended to protect the lender's side of the bargain, i.e. value securing the loan it made to the borrowers. Like the requirement to provide hazard insurance, to hold that this requirement assigning interests in claims for misrepresentation as to the value or condition of the real property constitutes an additional security interest would

> erode the safe harbor for residential lenders provided by § 1322(b)(2). To characterize proceeds generated only to protect a lender's security interest in real property as a separate security interest in personal property would necessarily mean that a lender could not protect its security interest through government condemnation, conveyances out of trust or fraudulent and deceptive acts. The borrower's agreement to assign such proceeds is not a separate or additional security interest, but merely a provision to protect the lender's security interest in the real property.
>
> A financial or economic analysis establishes that, like hazard insurance, the assignment of claims or proceeds of claims for misrepresentation as to the value or condition of the real property does not serve as additional collateral. If Household secured the loan with the real estate and a certificate of deposit or an automobile, the certificate of deposit or automobile would serve as additional collateral in addition to the value of the real estate. However, in the case of proceeds from hazard insurance or from a claim for misrepresentation as to the value or condition of the real property, the proceeds replace the value lost in the real estate due to the fire or other damage or due to the misrepresentation, rather than serving in addition to the value of the real estate. Thus, the proceeds serve as replacement security, thereby encouraging lenders to loan money based upon the real estate—the stated legislative purpose for the exception.

*In re Kreitzer*, 489 B.R. at 705–06; *see also Stevens*, 581 B.R. at 541 (misrepresentation damages protect the lender's interest "much like hazard insurance protects a lender's interest if the rea property is damaged or destroyed.").

Thus, misrepresentation damages fall within the protections afforded by *Davis* and do not serve as additional security. Additionally, because the Deed of Trust is a standard Fannie Mae/Freddie Mac form, this provision is likely in millions of mortgage loans. Because "*Davis* stands for the proposition that an interpretation of [the anti-modification provision] that takes most mortgages outside the anti-modification protection [provided by the statute] would eviscerate the protective exception for residential lenders and be contrary to the Congressional intent in creating [the anti-modification provision]," *Darlene M.*, 542 B.R. at 786, this Court should conclude that the Debtor cannot modify BONY's claim. Confirmation of the Plan should be denied.

## CONCLUSION

Based on the foregoing, BONY respectfully requests that this Court deny confirmation of the Debtor's Plan.

Respectfully submitted, this 13th day of November, 2018.

        */s/ Bret J. Chaness*
        BRET J. CHANESS (BPR # 31643)
        **RUBIN LUBLIN TN, PLLC**
        3145 Avalon Ridge Place, Suite 100
        Peachtree Corners, Georgia 30071
        (678) 281-2730 (Telephone)
        (404) 921-9016 (Facsimile)
        bchaness@rubinlublin.com

*Attorney for The Bank of New York Mellon FKA the Bank Of New York, As Trustee for the Certificateholders of the CWALT, Inc., Alternative Loan Trust 2006-OC10, Mortgage Pass-Through Certificates, Series 2006-OC10*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2018, a copy of the within and foregoing was filed via CM/ECF, which will serve notice on all necessary parties.

        */s/ Bret J. Chaness*
        BRET J. CHANESS (BPR # 31643)

13

Case 3:17-bk-06895  Doc 121  Filed 11/13/18  Entered 11/13/18 19:23:51  Desc Main
Document  Page 13 of 13